[No. 604. Decided March 7, 1889.]

NORTHERN PACIFIC RAILROAD COMPANY v. DAVID O'BRIEN.

MASTER AND SERVANT—NEGLIGENCE—PLEADING—EVIDENCE.

The plaintiff, with others, was employed as a laborer by the defendant in "surfacing" defendant's track. While being taken to his work by a gravel train furnished for that purpose by defendant, the plaintiff was injured by a collision with a "wild train" in charge of defendant's servants. The gravel train was on its regular time, and the "wild train" had orders to flag it. The rules of the defendant company required the person flagging to be three-fourths of a mile ahead of the flagging train, but the "wild train" followed within four hundred feet of its flagman, whose signal, by reason of a curve in the road, could not be seen by the gravel train till upon it. The engine of the wild train was so disabled that it could not be quickly started or stopped. These facts being undisputed, an instruction to the jury that it was gross negligence for the wild train to be where it was when the collision occurred, was not error,

as the facts, undisputed, are such as to enable the court to say, as a matter of law, that they constitute negligence. (ALLYN, J., dissenting.)

Under the facts stated, the conductor and engineer of the wild train were not fellow-servants of the workman on the gravel train, or engaged in the same common employment.

The burden of proving contributory negligence rests upon the defendant.

Evidence of the defects of the engine was admissible, under the complaint, which alleged, generally, that the collision was caused by defendant's gross negligence, and though the allegations were not broad enough to cover it, its admission would be no ground of exception under Code Wash. T., § 105.

Under the allegations that plaintiff was permanently disabled to follow his occupation, and rendered unable to earn a livelihood, evidence of his prior occupation and wages is admissible, and, though such allegations were not broad enough, the admission of the evidence would not be ground of exception under § 105 of the code.

### *Error to District Court, Yakima County.*

Action by David O'Brien against the Northern Pacific Railroad Company for injuries sustained by the collision of defendant's gravel train, which was in charge of O. C. Hulett, with a "wild train." The complaint alleged "that while plaintiff was being so conveyed to his work by the defendant, and about two and a half miles from said station of Cle-Elum, in said Kittitas county, a collision occurred on the said railroad, and between said work train, on which plaintiff was being so conveyed, and a locomotive and tender coming from an opposite direction, under authority and direction of defendant, and meeting the said work train, which collision was caused by the gross negligence and carelessness of the defendant and its servants, and the plaintiff was thereby greatly injured. That his ribs were broken, his shoulders broken, his head and spine were bruised and fractured, and other parts of his body were bruised and fractured, from which injuries he suffered intense and long continued pain, and still suffers great pain, and will always continue

to suffer great pain, and was permanently disabled from following his occupation, and rendered unable to earn a livelihood for himself." Defendant brings error.

*McNaught & Mitchell*, and *N. T. Caton*, for plaintiff in error.

*Reavis, Mires & Graves*, for defendant in error.

The opinion of the court was delivered by

BURKE, C. J.—From the undisputed evidence in the record before us in this case, it appears that in April, 1887, David O'Brien, the defendant in error, was employed by the Northern Pacific Railroad Company, the plaintiff in error, as a common laborer in the work of "surfacing" its track between Cle-Elum and Martin, in Kittitas county, Wash. T. On the 21st of April, 1887, and for some days before that, this "surface gang" were engaged at work near a point on the Northern Pacific Railroad about six miles west of Cle-Elum, known as "Nelson's Siding." For some time previous to the 21st of April, the "surface gang" were taken to their work every morning from Cle-Elum on a gravel train provided for that purpose by the company; were brought back to Cle-Elum at noon for their dinner; after dinner, usually about 12:45 P. M., they were taken to their work again on the gravel train; and at night the same train brought them back to Cle-Elum. On the 20th of April, 1887, the conductor of the gravel train received his usual orders for the next day's work, directing him to work between Cle-Elum and Nelson's siding, and to look out for trains going east. On the 21st of April, another train, belonging to the same company, and consisting of a large, heavy engine, intended for mountain work, a tender, and box car, was sent out from Easton as a "wild train," with orders to flag against the gravel train working between Cle-Elum and Nelson's siding. The engine of the wild train was out of repair, and so badly disabled that it

could neither start up nor stop with anything like the promptness of such an engine in good order, and at the time in question was on its way to the company's repair shops at Ellensburgh.   The engine was reversing; the tender being in front.  By the rules of the company "flagging against other trains" was required to be done by sending a man ahead of the flagging train three-quarters of a mile with danger signals; and the person giving the signals was required to locate himself so as to be plainly seen, and to make the signals in such a manner as to be plainly understood.  The conductor of the wild train sent a flag-man ahead, but, instead of keeping the train three-quarters of a mile behind him, the train followed the flag-man so closely that there were not to exceed 300 to 500 feet between them.   About midway between Cle-Elum and Nelson's siding there is a 10-degree curve, on one side of which is the Yakima river, and on the other a rocky bluff of considerable height.   As the flag-man turned the western end of this curve, his own train being not more than 300 or 400 feet behind him, he saw the gravel train from Cle-Elum approaching; but owing to obstructions on the side of the track, which intercepted the view between the engineer of the approaching train and the flag-man, the signal could not be seen until the train was upon the flag-man, and the result was a fatal collision between the two trains. The gravel train consisted of a flat car, which was in front, an engine, and a caboose car.   There were about 30 laborers, including defendant in error, upon the flat car.   This flat car was driven by the force of the collision into the tender of the engine of the other train. Seven men were killed outright, and many others more or less seriously injured. The defendant in error was hurled from the car by the shock of the collision, falling upon his head on the rock of the bank of the river, some 15 or 20 feet from the track.   When found, he was unconscious. His head was badly cut, one of his teeth was knocked out,

his right clavicle was broken, and he was badly bruised and lacerated on other parts of his body. The collision occurred between 12:50 and 1 o'clock in the afternoon of the 21st. So far there is no dispute as to the facts. The evidence as to the rate of speed at which the gravel train was running at the time of the collision was somewhat conflicting; some of the witnesses putting it as high as 35 miles an hour, and some as low as 12 miles an hour. To our mind the evidence warrants the belief that the train was running at about 18 miles an hour, the highest rate of speed allowed by the rules of the company. The evidence, moreover, clearly shows that the flat car was designed for the laborers to ride on to and from their work, and that the caboose was reserved for the use of the train men.

That this disastrous collision was caused by the gross negligence of the conductor and engineer of the train going down to Ellensburgh, that is, the "wild train," there can be no doubt whatever. It would be difficult to conceive of a case of more wanton, inexcusable negligence than that of which the conductor and engineer of that train were guilty. They must have known from the time that they left Nelson's siding that the gravel train was then on its way from Cle-Elum, carrying the laborers to their afternoon work, and that the two trains must inevitably meet somewhere on that six-mile stretch; yet with this knowledge, and in direct violation of the rules of the company and of ordinary prudence, they ran their train to one of the sharpest curves on the line, leaving the flagman only three hundred feet ahead of them to warn the approaching train of the danger.

Exception has been taken to the instructions of the court below upon this head; and, as counsel for the plaintiff in error has laid great stress upon this exception, we give the instructions complained of: "The train with which Hulett's train collided, and which had orders to flag against Hulett's train, had no business to be where it was at the time of the collision. It should have remained at the point where the

flagman was put off and sent forward, until he had proceeded a sufficient distance forward to guard against accident; but, instead of that, the train followed behind the flagman only a few hundred feet, and was thereby placed in a position where it was impossible to prevent a collision with the train which came dashing around the curve, with its load of human freight, ignorant of the impending danger." "This was gross negligence on the part of those in charge of said train, and, the facts being undisputed, it is the duty of the court to tell you so, and not to confuse you with abstract definitions of negligence which you may not understand alike, and may therefore have difficulty in applying." We think these instructions correctly stated the law applicable to the facts of this case. Negligence is a question of mingled law and fact, and, where there is any conflict in the evidence, the question is submitted to the jury under proper instructions; but whether a given state of facts constitute negligence in any case is a question of law for the court. In this case, as we have seen, the facts which are alleged to constitute the negligence were established by undisputed evidence. In such a case it becomes the duty of the court to declare, as a matter of law, whether the facts thus proved do constitute negligence. 1 Shear. & R. Neg., §§ 52, 53, 56; *Dascomb v. Buffalo, etc., R. R. Co.* 27 Barb. 221; *Catawissa R. R. Co. v. Armstrong*, 52 Pa. St. 282; *Carter v. Towne*, 103 Mass. 507. This the court did, in language to which, indeed, exception has been taken, but which, though open to criticism, does not furnish ground for the reversal of the judgment below. The court, in subsequent parts of the charge, qualified and restrained the force of his words in this instruction, and particularly cautioned the jury against prejudice or passion in making up their verdict.

But, admitting that the collision was caused by the gross negligence of the conductor and engineer of the "wild train," it is contended on behalf of the plaintiff in error

that under the rule which exempts the master from liability to a servant for injuries caused by the negligence of a fellow-servant, in the same common employment, the railroad company cannot be held responsible to the defendant in error in this case. This, it seems to us, presents the only question of real difficulty in this case. If the conductor and engineer were fellow-servants of the laborers working on the track, and engaged in the same common employment, then the company is not liable to the defendant in error for the injuries he received in the collision. The general rule of law on this subject is well settled; but as it was interpreted in the Farwell case, 4 Metc. 49, and in the other cases following the Farwell case, its injustice long ago became so manifest, and was so frequently dwelt upon, both by text-writers and courts, that in recent years the courts have shown a strong tendency to graft important limitations upon the general doctrine. In some of the states the legislatures have abolished the rule altogether; and in England the rule was carried to such an extent that in 1880 parliament felt called upon to interfere, and the result was the "employers' liability act." It is not, however, our purpose to review the authorities upon this rule, or to discuss it at any length, for we think the recent decisions of the supreme court of the United States upon this subject are decisive of this case; and as the amount involved is large enough to bring the case within the jurisdiction of that court, if we err in our decision, we have no doubt the losing party will take the case to the supreme court for review and correction.

In our view, then, of the law, the conductor and engineer of the "wild train" were not fellow-servants of the laborer O'Brien, the defendant in error in this case, or engaged in the same common employment with him. One of the rules of the Northern Pacific Railroad Company expressly provided that "trains are to be run under the direction of the conductor, except when such direction

conflicts with these rules, or involves risk or hazard, in which case the engineer will be held equally responsible." These men were not only engaged in totally different departments of work, but they stood in a different relation to their common principal. The conductor and engineer were agents of the corporation, clothed with the control and management of a distinct department of the business of the company. They had, on this occasion, the entire control and management of the train, and were to all intents and purposes the personal representatives of the company, for whose negligence it is and ought to be responsible to the defendant in error, and other subordinates similarly employed. On page 394, the court, in *Chicago, etc., Ry. Co. v. Ross*, used this language: " The conductor of a railway train who commands its movements, directs when it shall start, at what stations it shall stop, at what speed it shall run, and has the general management of it, and control over the persons employed upon it, represents the company, and therefore that, for injuries resulting from his negligent acts, the company is responsible. If such a conductor does not represent the company, then the train is operated without any representative of its owner." *Chicago, etc., Ry. Co. v. Ross*, 112 U. S. 377 (5 Sup. Ct. Rep. 184). The case, then, stands the same as it would if the president of the company or the board of directors were on the train, commanding and directing its movements, and committing the acts of gross negligence here imputed to the conductor and engineer. No one questions that, where the master himself is guilty of negligence resulting in an injury to one of his servants, the master is responsible for such injury. An attempt has been made here to distinguish the case at bar from *Chicago, etc., Ry. Co. v. Ross*, by the circumstances that in the latter case the injury was caused by the conductor of the train on which the injured person was employed at the time, whereas in the case at bar the person whose negligence caused the injury was con-

ductor of another train, and not of the train on which the injured person was riding. We can see no difference in principle between the cases. In each case the party guilty of negligence stood as vice-principal. He represented the company, he was engaged in a totally different department of labor from that in which defendant in error was employed, and he stood in a very different relation to their common principal. *Northern Pacific R. R. Co. v. Herbert,* 116 U. S. 642 (6 Sup. Ct. Rep. 590); *Cunard Steamship Co. v. Carey,* 119 U. S. 245 (7 Sup. Ct. Rep. 1360).

We will now briefly notice the other exceptions relied upon by plaintiff in error to reverse the judgment of the court below.

The court below charged the jury that the burden of proof as to contributory negligence rested upon defendant. To this the defendant excepted. We think the charge of the court on this point was a correct statement of the law. It is true that in some states a different doctrine prevails; but in our view the better reason, as well as the weight of authority, is with the courts holding that the burden of proof is upon the defendant to show contributory negligence upon the part of the plaintiff in cases of this character. 1 Shear. & R. Neg. (4th ed.), §§ 108, 109; *Hough v. Railway Co.,* 100 U. S. 213; *Northern Pacific R. R. Co. v. Mares,* 123 U. S. 710, 721 (8 Sup. Ct. Rep. 321); *Indianapolis, etc., R. R. Co. v. Horst,* 93 U. S. 291; *Railroad Co. v. Gladmon,* 15 Wall. 401.

Exception was taken by the plaintiff in error to the admission of evidence, under the complaint, tending to show defects in the engine; and also to the admission of evidence introduced to show what defendant in error had been "working at prior to the collision, and what wages he had generally received." The object of this latter testimony was to furnish some basis for the estimation of the damages which defendant in error claimed to have suffered. We do not think the exceptions were well taken in either case.

The allegations in the complaint were broad enough to cover such testimony; and, even if they were not, this would furnish no ground of exception, in view of § 105 of our code.

We find no error in the record, and the judgment of the district court is therefore affirmed.

LANGFORD, J., concurs.

ALLYN, J., (*dissenting*).—I do not concur in the opinion filed herein.   While the result may be justified by the facts of the particular case, I cannot approve of certain of the instructions as set out in the opinion.   I doubt greatly the propriety of the court assuming to take the question of negligence from the jury.   The case should be very exceptional where this may be done at all.   And in this case the result of this was to ignore all explanation offered and excuse presented as insufficient, on the sufficiency of which I feel the jury may much more safely pass than the court. But the language and manner of the instructions (being the instructions first quoted in the opinion) are certainly subject to criticism.   In this class of cases (personal injury) jurors are, ordinarily, ready enough to see these features, and need no graphic picture of the scene in the charge.   The court cannot too carefully avoid language which may imply to the jury possible feeling, or, in the most remote way (though not intended), influence them. The tendency of courts to refer to and comment on the evidence, and thus take from the jury that which is exclusively given to their keeping, cannot be too carefully avoided, or too strongly guarded against.   In my judgment the choice of terms by the lower court was (that to which I have reference), unfortunate, and properly subject to criticism; while I am equally satisfied they were not so intended, and merely the result of oversight, incident to a necessarily hasty consideration, at the trial, of a very large number of instructions, as may not unfrequently happen.